JOURNAL ENTRY AND OPINION
Appellant (father) appeals the court's award of permanent custody of his five-year-old son to the county.
Father, a self-proclaimed Reverend, is married to the child's mother. Mother is diagnosed with serious schizophrenia, and father is diagnosed with bipolar disorder. At birth the child was placed with the county because the hospital authorities determined that neither parent was able to care for him. When the parents completed their case plan, which included parenting education as well as treatment and medication for their mental disorders, the one-year-old child was returned to them under protective supervision.
When he was just under five years old, the county removed the child from the home again because the mother had written to the county stating that the father had been physically abusing him. At the time she sent the letter, mother had run away from the home.[1] At that time the child was observed to have a pattern of lesions on his inner arm. He told his treating psychologist that his father had burned him with cigarettes because he was a bad child. The father claims that the lesions were impetigo and produced a pharmacy patient information sheet for an antibiotic for the child.[2] Handwritten on the bottom of this printed sheet is Impetigo diagnosis/phisohex liquid soap/bacitracin ointment/Keflex. The handwriting on the sheet was not authenticated.
The child was noted to be significantly underdeveloped both physically and mentally. He was the size of a two-year-old, did not know how to feed himself, drink from a cup or use the toilet, had no social skills and limited verbal skills, and if given food would gorge himself until he threw up. His foster mother also testified that every night he had nightmares in which he screamed that Jesus was in the closet and was going to kill him.
In December of 1999 the child was admitted to Laurelwood Hospital for psychiatric treatment because, following a visit with his father, his behavior became so disruptive that he required treatment. He was diagnosed as having chronic posttraumatic stress disorder, which manifested itself in hallucinations and delusions. His prognosis was considered to be [p]oor if he goes back with his mentally ill parents. His prognosis was considered good if [the PTSD] is treated immediately long-term with appropriate intensive psychotherapy, and with placement in a stable home which could be only a long-term placement. (Emphasis added.) Laurelwood Hospital Discharge Summary. Further, the medical doctor stated in the discharge summary: [the child] talked about his father burning his arm with cigarettes `because I was bad'. He should remain in the custody of the CCFS and he should have only professionally supervised visits or not [sic] visits at all with his parents.
Id. Finally, the doctor recommended that the child should have a stable, long-term placement to ensure better conditions with his development. Id.
In addition to the recommendation of his treating psychiatrist, the child's guardian ad litem also strongly recommended permanent custody with the county. She noted that father's inappropriate religious remarks frightened the child. Since 1998 this guardian ad litem has recommended removal of the child from the parent's home and termination of the child's visits with his father because of the father's frightening remarks.
The father refused to participate in the case plan prepared by the social worker. He stated to the guardian ad litem that the Lord would show them the way to care for their son. Report of Guardian ad litem, 12-17-98. He also told the social worker that his son was the second coming of Christ. The father would not allow the social worker to inspect the home. He explained, I ain't used to a European coming in my house, you know? Tr. June 26, 2000 at 21. He refused to acknowledge any responsibility for the removal of his son from his home. Instead, he stated I feel likes it's modern day slavery. I feel like that if you, as your opinion, got a right to come and take our babies away from us, it's just like in Roots, the movie, like slavery. Tr. June 6, 2000 at 3.
The father finally did agree to submit to a psychological exam. Father admitted to the psychologist that he had been diagnosed with bipolar disorder and had received SSI for a 100% mental disability since 1985. Father claimed that he was cured of his bipolar disorder because his religion had cured him and, therefore, that he no longer needed medication for it. He also admitted that he continued to receive SSI payments despite his cure.
Father told the psychologist that his problems with the county were a result of religious prosecution by the caseworker. He also told the psychologist that although he considers his wife, the child's mother, to be unstable and violent, if he had to he would leave the child alone with her. The psychologist concluded, [b]ased on the findings of this evaluation, this examiner cannot recommend that [the child] be returned to his father. Furthermore, the status of this case has a poor prognosis for improvement and the court should consider permanent placement out of the home. Report of Psychologist, April 5, 2000, at 10.
 For his only assignment of error, appellant states THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY SINCE (1) NONE OF THE CIRCUMSTANCES SET FORTH IN R.C. 2151.414(E) WERE PROVEN BY CLEAR AND CONVINCING EVIDENCE AND (2) THE JUDGMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
R.C. 2151.414(E) states in pertinent part In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with his parents, the court shall consider all the relevant evidence. If the court determines, by clear and convincing evidence,* * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:
 (1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness * * * of the parent is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *.
 (3) The parent committed any abuse as described in section 2151.031 of the Revised Code * * * against the child * * * between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody * * *. (Emphasis added.)
Focusing on the county's alleged failure to prove that the marks on the child's arm were cigarette burns, father claims that the county thereby failed to prove neglect. He states [t]he evidence fails to establish by clear and convincing evidence that [father] in any way abused or neglected his son; therefore, his failure to follow the case plan does not amount to a failure to remedy conditions in that without proof of abuse, neglect or dependency, there are no conditions to remedy. Appellant's Brief at 11.
The complaint, alleging abuse, neglect, dependency and requesting permanent custody, was filed on April 17, 2000. After the marks on his arm were noted, the child was placed in emergency custody on July 27, 1999. The time period referenced in R.C. 2151.414(E)(3), therefore, is between July 1999 and April 2000. In December of 1999, the child was hospitalized because he was so terrorized by his father's preaching he hallucinated that Jesus was coming after him. At that time, the treating physician recommended strict supervision or termination of the visits with the father.[3]
Father alleges that, despite the evidence contained in the psychiatrist's report, the county failed to show that his son was an abused child. R.C. 2151.031(C) includes in its definition of an abused child one who [e]xhibits evidence of any * * * physical or mental injury * * * inflicted other than by accidental means * * *. Subsection (D) also includes any child who [b]ecause of the acts of his parents * * * suffers * * * physical or mental injury that harms or threatens to harm the child's health or welfare.
The fact that the child was hospitalized after a traumatic visit with his father, that his father caused his nightmares by telling him Jesus was hiding in the closet of his foster mother's house, and that the child explained to his psychiatrist he was a bad child and as evidence pointed to the cigarette burns on his arm are all clear and convincing evidence that the child was the victim of abuse as defined by R.C. 2151.03.1(C) and (D).
Even without the clear and convincing evidence of neglect, the court had clear and convincing evidence that the parents suffered from chronic mental illness so severe that it prevented them from providing an adequate home for the child at the time of the hearing as well as in the foreseeable future and thus did not meet the requirements of R.C.2151.414(E)(2). The father's psychological report clearly stated that his denial of his illness, coupled with his refusal to take medication, rendered him unfit to care for the child. Father assured the examiner that he no longer suffers from [bipolar disorder] because his religious faith cured him. He does not receive any medical care for this disorder because he does not feel it is necessary. Psychiatric report of Larry Sowell at 8. The court therefore had clear and convincing evidence under R.C. 2151.414(E)(2) that permanent county custody was appropriate.
Father complains that he had no obligation to follow the case plan because the county failed to prove its allegations of neglect or abuse. This argument fails not only because the county proved by clear and convincing evidence that the father abused the child prior to the child's removal from the home, but also because the father's untreated mental illness by itself provides clear and convincing evidence to support the award of permanent custody to the county.
The second portion of father's assignment of error states that the court's judgment was against the manifest weight of the evidence. Because this court has found that clear and convincing evidence exists to support the judgment of the trial court, this argument is without merit. [w]hen reviewing awards of permanent custody to public children services agencies, judgments supported by some competent, credible evidence must be affirmed. In re: Thomas (Mar. 9, 2000), Cuyahoga App. Nos. 75330, 75331, 75332, unreported, 2000 Ohio App. LEXIS 885, at *10. The county provided sufficient credible evidence to support the court's findings that the child was abused and that the child cannot be reunited with his parents.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court Division of the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, J., and ANNE L. KILBANE, J., CONCUR.
 _____________________________________ DIANE KARPINSKI, ADMINISTRATIVE JUDGE
[1] Father would lock mother in the house when he was not there to prevent her from leaving. The case plan included a provision that father would not lock mother in the house.
[2] The antibiotic prescribed for the child was an oral cephalosporin, which is the drug of choice for some forms of impetigo.
[3] Both the psychiatric exam of the child and the psychological exam of the father were admitted into evidence without objection.